**LEX TECNICA LTD**
ADAM R. KNECHT, ESQ.
Nevada Bar No. 13166
JESSICA RENNEKER, ESQ.
Nevada Bar No. 9658
10161 Park Run Drive
Las Vegas, Nevada 89144
adam@lextecnica.com
jess@lextecnica.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| LEX VEST LTD, a Nevada limited liability company;<br><br>Plaintiff,<br><br>vs.<br><br>EMANATIONS COMMUNICATIONS GROUP LC, a Utah limited liability company; DOES 1 through 50; and ROE ENTITIES 51 through 100, inclusive,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF** |

This complaint is for breach of a loan agreement. Though Plaintiff has seized and perfected its security interest in and now owns the collateral, Defendant members have continued to threaten suit to contest these agreements and plaintiff's ownership of the seized collateral. As such, Plaintiff, Lex Vest LTD, by and through its attorneys of record, Lex Tecnica, hereby complain against Defendant Emanation Communications Group, LC, for damages and declaratory relief in Federal Court, as follows:

## **PARTIES**

1.  Lex Vest LTD ("Lex Vest") is, and at all relevant times was, a Nevada limited liability company doing business in Clark County, Nevada.

2.  Emanation Communications Group, LC ("Defendant" or "Emanation") is, and at all relevant times was, a Utah limited liability company doing business in Salt Lake County, Utah.

1

3. DOES and ROES, yet to be properly identified or named, including those third parties referenced herein for which facts are known, but identity or location is still being solidified, including one Mr. Karony whose location and residence is unknown, but whose residence appears to be international.

## JURISDICTION BASIS

4. This Court has jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 as the Plaintiff and Defendants have complete diversity of citizenship and the amount in controversy exceeds $75,000.

5. Venue is proper in this Court under 28 U.S.C. § 1392(a)(2).

6. Jurisdiction and venue are proper in this judicial district because the action involves negotiated contractual agreements entered into between the Plaintiff parties wherein it was agreed that all disputes under said contractual agreements would be governed by, and enforced in accordance with, the laws of the state of Nevada; and that Defendant further stipulated to submit to the non-exclusive jurisdiction of the federal or state courts located in Nevada in any action or proceeding arising out of or relating to such contractual agreements.

## GENERAL ALLEGATIONS

**A.     Ms. Karony Seeks Bridge Loan Financing for Research and Development**

7. Defendant held various license-based rights and interest in five (5) patents, which relate to the manufacture of nanomaterial, and one (1) provisional patent that relates to wind turbines.

8. The members of Defendant are Jennifer Karony, holding a 50.66% membership interest, and her son, one Mr. Karony, holding a 33.34% membership interest (*see* Sec. 1.2). Per the Operating Agreement, the remaining 16% is unassigned and held in trust and controlled by Ms. Karony. Pursuant to the Defendant's Operating Agreement, 50% of the membership interest is required to bind the company, including to secure financing from a lender (*see* Sec. 5.1).

9. Moreover, per Sec. 5.3 of the Operating Agreement, "a majority of the Members… may execute any instrument, documents, agreements, certificates, affidavits or other writings on behalf of the company, without the consent or signature of other Member(s) or any other person

being required, including, without limitation… (a) all deeds, notes… (d) all promissory notes… security agreements… financing statements and other similar documents; (e) all guarantees of any indebtedness; and (f) all other instruments, documents, agreements, certificates, affidavits or other writings of any kind or nature relating to the affairs of the Company wither like or unlike the foregoing."

10. Further, per Sec. 5.4 of the Operating Agreement, third parties contracting with Defendant, such as Plaintiff, are entitled to fully rely upon the representations of Ms. Karony as the Manager of Defendant, and "[n]o third party dealing with the company shall be required to ascertain whether the Managers executing any such instrument, document, agreement, certificate… or other writing is acting in accordance with the provisions of this Agreement."

11. In or around May of 2022, Ms. Karony approached Plaintiff in urgent need of capital. Defendant needed a bridge loan for the purchase of research and development equipment and materials to further fund nanotechnology research and development for use in Africa.

12. In particular, at that time, Ms. Karony stressed that a particular piece of lab equipment needed to be purchased immediately for $20,000, and additional funds were necessary to maintain operations.

13. Defendant made representations that the value of the business was more than one and one-half million dollars ($1,500,000), due to the intellectual property and patent licenses controlled by Defendant.

**B.     Defendant Enters into Loan Agreement, Backed by Collateral, with Lex Vest.**

14. In response to its need for financing to fund the operation of its research and development of nanotechnology, the parties negotiated multiple versions of and then entered into a Loan Agreement, Promissory Note, and Intellectual Property Security Agreement on or around June 30, 2022., as amended (collectively, the "Loan Agreements"). The Loan Agreements went through various iterations and included feedback from their respective attorneys.

15. Under the Loan Agreement, Lex Vest agreed to lend Defendant up to One Million Dollars ($1,000,000) or more with interest accruing at the rate of Eighteen Percent (18%) ("Interest") if Defendant met performance guarantees called "Milestones".

16. The loan to be provided to Defendant was a short-term bridge loan. Defendant agreed to repay the principal loan in full, with interest, and a loan fee of $10,000, and a twenty-four percent (24%) default interest rate.

17. The Loan Agreement defined various "Events of Default," the occurrence of any one of which would constitute a default under the Loan Agreement and allow Lex Vest to take possession and control of certain collateral and effectuate a seizure thereof. Indeed, pursuant to the Loan Documents, Defendant agreed that "[u]pon the occurrence of an Event of Default..., the non-defaulting Party or Parties, or any one of them, may, at its option and without notice or demand, effectuate Seizure..." of certain collateral.

18. The term "Collateral" under the Loan Agreement was defined in an Intellectual Property and Security Agreement also entered into between Defendant and Lex Vest on or about June 30, 2022 ("Intellectual Property and Security Agreement"), (and was later expanded through amendments to include all lab materials, equipment, properties, and assets whether owned or controlled by Defendant or its affiliates).

19. Under the Intellectual Property and Security Agreement, to secure its obligations under the Loan Agreement, Defendant granted and pledged to Lex Vest a security interest in all of Defendant Emanation's right, title, and interest in, to and under its intellectual property (the "Collateral"), including, without limitation:

    a. Any and all trade secrets, and any and all intellectual property rights now existing, acquired or held;

    b. Any and all design rights that may be available to [Defendant] now existing, acquired or held;

    c. All patents, patent applications and like protections including, without limitation, licenses, improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same, including without limitation the patents and patent applications set forth (collectively, the "Patents");

  d. All current unpatented, or yet to be patented designs, utilities, uses, applications, methods, or art, discovered or to be discovered by [Defendant];

  e. Any and all claims for damages by way of past, present and future infringements of any of the rights included above, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the intellectual property rights identified above;

  f. All licenses or other rights to use any of any Patents, and all license fees and royalties arising from such use to the extent permitted by such license or rights;

  g. All amendments, extensions, renewals and extensions of any of the Patents; and,

  h. All proceeds and products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

20. Defendant concurrently entered into the Promissory Note with the Loan Agreement, and the Intellectual Property and Security Agreement with Lex Vest. Furthermore, Jennifer Karony, the Manager, CEO and majority owner of Defendant, entered into a Personal Guaranty with Lex Vest, wherein she personally guaranteed Defendant's performance under the Loan Agreements, Loan Agreement Intellectual Property and Security Agreement, and Promissory Note, as amended (hereafter, the "Loan Documents").

21. Defendant agreed that the Loan Documents would be governed by, and enforced in accordance with, the laws of the state of Nevada. Furthermore, Defendant agreed to submit to the non-exclusive jurisdiction of the federal or state courts located in Nevada in any action or proceeding arising out of or relating to the Loan Documents in any way. Defendant agreed to submit to personal jurisdiction in the courts of the State of Nevada regardless of where they resided, or wherever business activities may occur.

22. Defendant further agreed that if it failed to perform the provisions of the Loan Documents, it would pay all costs and expenses of collection, as well as all costs incurred to enforce

the Loan Documents, including attorneys' fees, whether or not arbitration or judicial proceedings were commenced. *See* Section 18 of the Loan Agreement.

23. Further, Defendant agreed that Plaintiff "had the right to obtain a preliminary injunction, without posting bond, in the event of non-payment or other breach, or in the event [Plaintiff] exercises its right of Seizure of the Collateral." Section 17 of the Loan Agreement.

**C.   Defendant Defaults Under the Loan Agreement and Lex Vest Seeks Further Assurances Through Amended Loan Agreements.**

24. Despite the Defendant's assurances that the Milestones would be met easily and quickly, the Milestones were not met. Plaintiff raised these concerns verbally several times with Defendant and memorialized them in writing to Defendant.

25. On or about July 11, 2022, Defendant informed Lex Vest of a verified yet unfiled draft complaint wherein Mr. Karony, Ronin Energy Group, and Ronin Real Estate Holdings LC, as plaintiffs, threatened to file claims for breaches of the Defendant's Operating Agreement, breach of fiduciary duty, fraudulent non-disclosure, and violation of the Utah Voidable Transactions Act against Defendant, as well as the same or related claims against its Affiliates, including Jennifer Karony. Defendant insisted the matter was untenable and could be resolved.

26. On or about July 11, 2022, Lex Vest informed Defendant that while it would assist in efforts to resolve the litigation threat, given Defendant's compromised position, any future loans would require additional assurances and/or greater Collateral. Lex Vest also communicated that Defendant "lack of demonstrable use of the technology as promised, casts a material cloud on the value of your business" and that it was "paramount that a demonstration [of] the nano-technology enhanced telecom technology be provided to us as soon as possible."

27. On or about July 13, 2022, in response to Lex Vest's request for further assurances, in an effort to cure the Event of Default, but recognizing Plaintiff's right to seize the Collateral, Defendant agreed to and entered into a First Amended Loan Agreement ("First Amended Loan Agreement") extending the Collateral and certain of the pending funding dates.

6

28.     Additionally, therein, Defendant agreed that Collateral under the Loan Documents would "include[] all equipment, machinery, lasers, alloys, office supplies, lab supplies (e.g. gases, tools, safety materials) and all other personal property located or used in the last twelve (12) months in the office(s) or lab(s) of the [Defendant] including those located at 190 N Cutler Dr, Suite D, North Salt Lake, UT 84054 and all right and title to any and all inventions, innovations, improvements, and applications of nano-technology and related inventions and innovations, trade secrets, and pending potential patent claims, [Defendant] claims since inception and that can be claimed by [Defendant] in the future."

29.     Under the First Amended Loan Agreement, Lex Vest had the right to seize the Collateral as follows:

> If an Event of Default is not cured to Lender's satisfaction within ten (10) days following notification from Lender to Borrower of such Event of Default, then in addition to Lender's right to collect the Loan Fee, (i) Lender may promptly seize and take possession and control of all the Collateral, and (ii) assign all Collateral to the entity of Lender's choice to effectuate the takeover, transfer, and exclusive ownership and control by Lender of the Collateral (a "Seizure"). Borrower agrees to promptly sign all paperwork necessary for the Seizure.

30.     Furthermore, under the First Amended Loan Agreement, Defendant agreed that "a threat of suit" or/and actual suit "by any individual, entity, or third party, for a claim that Lender interprets as equal to or larger than the Loan amount…" while not a breach, permitted Lender to seize the Collateral to protect and perfect Lender's interests in the same.

31.     Finally, Defendant acknowledged that "[t]he parties are aware that litigation may be likely against [Defendant], which increases Lender's desire to defend the loan and all the Collateral. In such a case, Lender may take over all title, right and control of the Collateral through Seizure, and assume legal right and control over the defense or offense of any litigation required to defend the Collateral."

32. Around this time, Plaintiff discovered that Defendant had executed a Management Agreement with a third-party entity named ECG Operations Group, LC, also a Utah limited liability company ("Operations"), with different management, accounts, books, assets, and employees, of which Ms. Karony and others were managers and employees. Plaintiff also discovered that *all* of the Collateral identified in the Loan Agreements (except for the exclusive patent licenses) was owned and in the possession and control of Operations, as a separate entity.

33. As such, on or about July 14, 2022, still in an effort to cure the Event of Default, but acknowledging Plaintiff's right to seizure, Plaintiff and Defendant entered into a Second Amended Loan Agreement ("Second Amended Loan Agreement") wherein Defendant further pledged all of the Collateral "whether controlled or owned by [Emanations], or any of [Emanations] Affiliates," which it identified as "(i) ECG Operations Group LC; (ii) Emanations Energy Group LC, and (iii) ECG IP Holdings LC, and any other affiliate or entity controlled or contracted with the Affiliates that could be a conduit for the Collateral to ensure the Collateral is owned and controlled by Lender."

34. Plaintiff then seized the Collateral and took possession and control of all the Affiliates as defined in the Second Amended Loan Agreement.

35. Shortly thereafter, Plaintiff met with the minority interest holder, Mr. Karony and his counsel to inform them of the Loan, the seizure of the Collateral, and of the Affiliates, and to address the concerns raised by Mr. Karony.

36. Over the course of multiple meetings and emails, despite the clear perfecting of the security interests held by Plaintiff, and now full control and ownership of the same, Mr. Karony's counsel continued to insist Ms. Karony had wasted millions of dollars, violated the Defendant's Operating Agreement, withheld disclosures required by Utah law, and as such, Mr. Karony, through his counsel, continued to threaten litigation.

37. Multiple times during the discussions with Plaintiff, Mr. Karony recognized the legitimacy of Plaintiff's ownership and offered to pay Plaintiff more than the Loan for the Collateral.

38. When Plaintiff questioned the value of the Collateral in relation to Mr. Karony's offer, Mr. Karony insisted a lawsuit would be filed unless Plaintiff sold and surrendered the Collateral to Defendant, despite Plaintiff's now clear ownership.

39. Plaintiff, desirous to avoid wasteful litigation, and resolve the matter expeditiously in the court of proper jurisdiction as agreed between Defendant and Plaintiff, and desirous to put to rest ownership of the Collateral, brought the instant suit.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

40. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint, inclusive, as if fully set forth herein.

41. Defendant and the Lex Vest entered into the negotiated Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement.

42. Mr. Karony's continued "threat of suit" constituted a curable but uncured Event of Default (now a breach) under the Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement.

43. Defendant also materially breached the Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement by failing to provide a demonstrable version of the nanotechnology.

44. As a result of the Emanation's material breaches of the Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement, Lex Vest has been damaged in an amount far greater than $75,000.

45. As a further result of the Defendant's conduct, Lex Vest has retained the services of attorneys, for which Lex Vest has incurred and will continue to incur attorney fees and costs.

## SECOND CLAIM FOR RELIEF

### (Declaratory Relief)

46. Plaintiff repeats and realleges the allegations set forth in all preceding paragraphs of this Complaint, inclusive, as if fully set forth herein.

47. Pursuant to the terms of the Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement, a "threat of suit" constituted a curable yet uncured "Event of Default," upon which "the non-defaulting Party or Parties, or any one of them, may, at its option and without notice or demand, effectuate Seizure" of the Collateral.

48. Pursuant to the terms of the Loan Documents, First Amended Loan Agreement, and Second Amended Loan Agreement, "[i]f an Event of Default is not cured to Lender's satisfaction within ten (10) days following notification from Lender to Borrower of such Event of Default, then in addition to Lender's right to collect the Loan Fee, (i) Lender may promptly seize and take possession and control of all the Collateral, and (ii) assign all Collateral to the entity of Lender's choice to effectuate the takeover, transfer, and exclusive ownership and control by Lender of the Collateral (a "Seizure"). Borrower agrees to promptly sign all paperwork necessary for the Seizure."

49. Multiple discussions with Mr. Karony and his attorney demonstrate that they will not withdraw their "threat of suit" and, in fact, have threatened to further escalate their suit against Defendant and its Affiliates, and Plaintiff.

50. Mr. Karony's attorneys have suggested that Plaintiff gave the Loan knowing the Defendant would default and as such, the Loan was merely a veiled purchase of a failing company. Mr. Karony's attorneys further claim, the Loan Documents were too hurried to be legitimate and therefore, should be unwound and the Collateral (even if not owned by Defendant but by the Affiliates) should be transferred to Mr. Karony (although he lacks privity or any legal relationship with the Affiliates).

51. Moreover, Mr. Karony's attorneys have insisted that unless Plaintiff sells its interest in the Collateral to Mr. Karony or the Loan Documents and Seizure are unwound Mr. Karony will also sue Plaintiff.

52. Lex Vest fully performed its payment obligations under the Loan Documents, including the First Amended Loan Agreement, and Second Amended Loan Agreement, and, as such, were entitled to take steps and did take steps, to seize the Collateral and Affiliates.

53. The terms of the Agreements require that the Defendant promptly sign all paperwork necessary for the Seizure. Defendant has done so.

54. Given the failure to meet the Milestones by Defendant, and the threat of suit by Mr. Karony, Lex Vest requested additional assurances from Ms. Karony acting as Manager and CEO of Defendant. She provided those in the First Amendment to the Loan Agreement.

55. When Plaintiff then discovered that Defendant did not own and control some of the Collateral, but that a separate entity controlled by Ms. Karony and others, owned and controlled the collateral, per the Management Agreement, Plaintiff required Defendant to sign a Second Amendment to the Loan Agreement and gave Defendant time to cure the Event of Default. Defendant did so.

56. Despite the extensions of time, Defendant failed to cure the Event of Default and has now breached.

57. Mr. Karony, a member of Defendant was given copies of the Loan Documents, assignments, and paperwork effectuating seizure, and plaintiff's ownership, and yet, he continued to insist he would file suit against Defendant and Plaintiff.

58. Given the foregoing, Mr. Karony insists a justiciable controversy exists as to Lex Vest's right to the Collateral, which Plaintiff desires to resolve.

59. To wit, Mr. Karony insists that Defendant, and namely, Ms. Karony, failed to provide proper disclosure to Defendant's books and records, despite three separate meetings and record review sessions attended by Mr. Karony, his counsel, and his representatives.

60. Moreover, Mr. Karony insists that Ms. Karony misappropriated funds, and Mr. Karony wants to place Defendant into receivership, not recognizing that Plaintiff has already legally seized and now owns the patent licenses that were once owned by Defendant.

61. Given Mr. Karony's offers to purchase and then threats of suit despite Plaintiff's clear right, ownership, and control to the patent licenses and other Collateral, and claims that Ms. Karony's alleged misconduct somehow voids the Loan Documents, makes the issue ripe for judicial determination.

62. Lex Vest is therefore entitled to a declaratory judgment that its Loan Documents, seizure, and current possession and control of the Collateral are proper and tenable.

63. Lex Vest has been damaged by Defendant's non-performance, and threat of continued litigation against Plaintiff despite Plaintiff's performance and rights under the Loan Documents.

64. As a further result of the Defendant's conduct, Lex Vest has retained the services of an attorney, for which Lex Vest has incurred and will continue to incur attorney fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Lex Vest prays for judgment against Defendant as follows:

1. For general, compensatory, expectation, and consequential damages in excess of $75,000;
2. For declaratory relief as set forth herein;
3. For reasonable attorneys' fees;
4. A preliminary injunction, including among other things, an order enjoining Defendant or those of its members, from damaging, or interfering with Plaintiff's ownership, control, and disposition of the Collateral, including an injunction against interference suits against Plaintiff in another venue;
5. For costs of suit incurred herein; and
6. For such other and further relief as the Court may deem appropriate.

DATED this 31st, day of July, 2022.

**LEX TECNICA LTD**

/s/ Adam Knecht
ADAM R. KNECHT, ESQ.
Nevada Bar No. 13166
JESSICA RENNEKER, ESQ.
Nevada Bar No. 9658
10161 Park Run Drive
Las Vegas, Nevada 89144
adam@lextecnica.com
jess@lextecnica.com
*Attorneys for Plaintiff*

12